UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | | |
|---|---|---|---|
| Gregory Terry, | | ) | |
| | Plaintiff | ) | |
| | | ) | |
| v. | | ) | Case No. 08-4063 |
| | | ) | |
| Edward Woller, | | ) | |
| | Defendant | ) | |

## ORDER

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me.  Now before the Court are the Plaintiff's Motion to Bar (#67); the Plaintiff's Motion for Partial Summary Judgment (#77); the Defendant's Motion to Bar (#88); and the Defendant's Motion for Summary Judgment (#92) . The motions are fully briefed, and the Court has carefully considered the arguments and evidence of the parties.

## JURISDICTION

Plaintiff Gregory Terry is a citizen of the State of Michigan.  Defendant Edward Woller is a citizen of the State of Illinois. The amount in controversy exceeds $75,000. This Court therefore has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. 1332(a)(1).

## DAUBERT MOTIONS

Both parties have filed motions seeking to bar an opposing expert witness. Federal Rule of Evidence 702 governs the admissibility of expert testimony. It states, in relevant part, that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact ... a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form

1

of an opinion..." It also requires that: (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case. *Id.*

Rule 702 requires the district court to perform a "gatekeeping" function before admitting expert scientific testimony in order to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993). See, Gayton v. McCoy 593 F.3d 610, 616 (7th Cir. 2010).

Under the Daubert framework, the district court must determine whether a given expert is qualified to testify in the case in question and, if so, whether his testimony is reliable. Daubert 509 U.S. at 592-93. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." Carroll v. Otis Elevator Co., 896 F.2d 210, 212 (7th Cir.1990).

In determining reliability, Daubert sets forth the following non-exhaustive list of guideposts: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; and (3) whether the theory has been generally accepted in the professional community. Daubert, 509 U.S. at 593-94, 113 S.Ct. 2786. The court should also consider the proposed expert's full range of experience and training in the subject area, as well as the methodology used to arrive at a particular conclusion. Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir.2000).

## PLAINTIFF'S MOTION TO BAR

Defendant has disclosed Sergeant Michael Britt as an expert witness. Plaintiff moves to bar Britt's testimony for the following reasons: (1) he was not timely disclosed; (2) he is not qualified

as an "expert"; and (3) his opinions are speculative, not based on facts and data. There are any number of problems with Plaintiff's motion.

As a threshold matter, the Motion to Bar is untimely filed. The deadline for *Daubert* challenges was May 14, 2010. (See Discovery Plan, Doc. #31). In an Order granting Defendant's motion to extend the deadline for Defendant to disclose his experts to May 1, 2010, the Court expressly stated: "No further extension of any deadline at the request of either party will be allowed without a showing of good cause." Plaintiff's Motion to Bar was filed on June 15, over one month late. At no time did Plaintiff seek an extension of the *Daubert* deadline. He simply assumed that the deadline was extended for 6 weeks because that was the period of time allowed in the original discovery schedule. This assumption was not based on any reasonable belief, especially in light of the explicit direction in the Order just cited. The motion should be denied on that basis alone.

Plaintiff's *pro forma* challenge to the content of the Defendant's disclosure of Britt is deemed waived[1], because of its lack of timeliness. In the interests of justice, however, and because the Court is ultimately the gatekeeper for the substance of expert testimony, the Court will consider Plaintiff's *substantive* challenges to Britt's testimony.

Plaintiff first insists that Britt is not qualified to testify about police practice and procedure in drug interdiction cases. This argument is without merit. Britt's CV reveals that his 25 year career

---

[1]Plaintiff mentions in passing and includes as an exhibit the disclosure Defendant served regarding Britt and his opinions. While it could be argued that the disclosure did not include everything that Rule 26 requires, Plaintiff has developed no such argument. Perfunctory and undeveloped arguments are waived. See Finance Investment Co. v. Geberit AG, 165 F.3d 526 (7th Cir. Dec. 23, 1998); Indurante v. Local 705, International Brotherhood of Teamsters, 160 F.3d 364, 366 (7th Cir. 1998); Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 668 (7th Cir. 1998), cert. den., 119 S.Ct. 890 (1999).
.

as a police officer was focused nearly exclusively on drug investigations and arrests. His service included a number of years on several drug task forces. He received awards for that service. Fed.R.Evid.702 and *Daubert* permit opinion testimony by a witness who is qualified by reason of experience, training or education.  Britt clearly meets that requirement.

Much of Plaintiff's remaining arguments do not go to the admissibility of Britt's testimony but rather to the weight that should be accorded to it. Where an opinion has "a reliable basis in the knowledge and experience of (a relevant] discipline," it is admissible.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999). Here, there is such a "reliable basis."

For example, Plaintiff argues that Britt's opinion is not based on any "formal studies" and is therefore inadmissible.  As Fed.R.Evid. 703 makes clear, an expert may base an opinion on facts or data "of a type reasonably relied upon by experts in the particular field." The Rule does not limit the "facts or data" to "formal" studies, whatever that might mean. Whether there are "formal studies" and, if so, whether Britt's opinions are consistent with them are questions properly pursued on cross examination; the lack of citation to any such "studies" does not  make Britt's testimony inadmissible.

Britt's Report explains that his opinions about drug trafficking come not only from his own experience but also from "specialized training to identify drug traffickers on the highways." He states that there are specific indicators that troopers are trained to look for.  His application of those "specific indicators" to the information he was provided about Terry's and Sanders' arrests are based on the types of facts and data that law enforcement officers - or, more specifically, drug interdiction agents - utilize. Any shortcomings as to the facts or data on which Britt relied may be explored with vigorous cross examination, but the lack of reliance on formal studies does not make Britt's

testimony unreliable.

The contribution of Britt's testimony to the jury's comprehension comes from his identification of indicators of drug trafficking - a matter about which the ordinary juror would have little or no knowledge - and from explaining how those indicators correlate to facts surrounding the trip taken by Sanders and Terry and the subsequent arrest. The cumulative effect of those indicators enables Britt to testify, subject of course to cross examination, to his conclusion that Terry was no innocent passenger.

The Court is, however, troubled about a few of Britt's opinions that lead up to that conclusion, namely his opinions regarding what Terry "knew" or "must have known" about the purpose of the trip, or about "why" Sanders tried to take the fall for the drugs. Nothing in Britt's experience qualifies him to testify specifically about Terry's knowledge or Sanders' state of mind.

To that extent, the motion to bar is allowed. Knowledge and state of mind are matters the jury will have to decide, based on all of the evidence, including but not limited to Britt's opinions. Britt cannot testify directly about the matters of Terry's knowledge or Sanders' state of mind. The fact that part of Britt's testimony is barred does not make his opinions on other matters suspect. See, e.g., Shreve v. Sears, Roebuck & Co., 166 F.Supp. 2d  378, 393 (D .Md.2001) (expert's lack of expertise in area of human resources precluded some of his opinions, but expertise as to construction market permitted opinions in that area).

Accordingly, the Motion to Bar Britt's testimony is GRANTED as to his opinions about knowledge and state of mind and DENIED in all other respects.

**DEFENDANT'S MOTION TO BAR**

Defendant moves to bar the testimony of Plaintiff's expert Richard S. Kling, whose states

his opinion as follows: Woller deprived Terry "of the effective assistance of counsel to which he was constitutionally entitled and engaged in legal malpractice but for which it is reasonably certain that Mr. Terry, whom the actual evidence showed was innocent of the charges, would not have been convicted."

Kling is a Clinical Professor of Law at IIT Chicago-Kent College of Law, where he has taught Evidence and Professional responsibility since 1985. During that time, he has also been a criminal defense practitioner, defending over 800 felony trials in the state and federal courts in the northern part of Illinois. He is certainly qualified to testify about the rules of professional conduct that govern attorneys in Illinois.[2]

Defendant asserts that, while Kling may be an expert generally speaking about the ethical concerns of practicing law, his qualifications do not extend so far as to opine about the effects in a Henry County case of the failure to call Sanders as a witness or to seek admission of Sanders' statements. During his deposition, Kling admitted that he has never handled a case in Henry County or in the Central District of Illinois. He has no specific knowledge of statistics about drug cases in Henry County and he knows no judges, prosecutors or defense attorneys in Henry County. In other

---

[2] As a general rule, experts may not opine on questions of law.. U.S. v. Farinella, 558 F.3d 695, 700 (7th Cir. 2009); Good Shepherd Manor Foundation v. City of Momence, 323 F.3d 557, 564 (7th Cir. 2003). In a legal malpractice action, the plaintiff must show that but for the alleged malpractice, the plaintiff would have succeeded in the underlying action. The merits of the underlying case and the law that applied in that case are therefore essential elements of a legal malpractice action, and expert testimony is admissible. Middle Mkt. Fin. Corp. v. D'Orazio, - F.Supp. 2d -, 2002 WL 31108260, at *8-9 (S.D.N.Y.2002)(an expert should be permitted to testify to the substantive law applicable to the underlying proceeding, at least to the extent necessary to explain the expert's conclusions that the defendant did or did not exercise the appropriate standard of care). Although no Seventh Circuit cases were found on point, Illinois law allows expert testimony on the law in legal malpractice actions. See, e.g. McLane v. Russell, 512 N.E.2d 366 (Ill.App.1987), aff'd 546 N.E.2d 499 (Ill.1989).

words, according to Defendant, Kling's expertise does not qualify him to testify as to tendencies in local courts as opposed to courts in Cook County or in the Northern District of Illinois.

Defendant asserts that geographic considerations may be relevant in determining whether a witness is qualified as an expert under Fed.R.Evid. 702, citing <u>U.S. v. Pugliese</u>, 712 F.2d 1574 (2d Cir. 1983); <u>Taylor v. Ouachita</u>, 648 F.2d 959 (5th Cir. 1981). Even if one assumes that these cases are apposite to the case at bar (which is questionable), this Court is not inclined to bar a witness based on 25+ year old cases from other Circuits. Moreover, as Plaintiff points out, the Rules of Professional Conduct apply to all lawyers practicing in Illinois, so to that extent, the geographical division created by Defendant is immaterial. Finally, to the extent that Kling's lack of specific knowledge of Henry County practices or statistics is important at all, it goes to the weight of his testimony and not to its admissibility.

Defendant also believes that some of Kling's testimony violates earlier Court Orders (#66 and #79) that limited ths scope of his testimony. In particular, those Orders prohibited opinions on causation, commentary about the Defendant's expert's testimony, and any opinion other than the one that had been timely disclosed, namely that the Defendant "violated attorney standards for a criminal defense lawyer."

Kling's report contains much commentary about the opinions of Defendant's expert witness. Any such testimony *on direct examination* is barred; of course, if appropriate, it may be explored on rebuttal.

Kling's Report also contains the conclusion that "the cumulative effect of Mr. Woller's errors and omissions ... definitely proximately led to Mr. Terry's conviction." That is an opinion on causation, and Kling may not testify to causation for two reasons. First, this opinion was not timely

disclosed by Plaintiff and was barred by the Orders mentioned above. Second, the conclusion whether any breach of duty on Woller's part caused Terry's conviction is a question the jury must answer. It is not a matter for an expert.

One other aspect of Kling's testimony is troubling to the Court. In numerous parts of his Report he mentions the Constitution, as in his conclusion that Woller engaged in behavior "violative of ... Terry's Sixth Amendment constitutional rights" (p.2 of Report) or that Woller's performance was "constitutionally ineffective" (p. 6 of Report). Yet the only cited authority for his opinions is Rule 1.7 of the Code of Professional Responsibility. There being no basis whatsoever in his Report for any discussion of constitutional standards, Kling is prohibited from testifying about such standards in this case. He is limited to a discussion of Rule 1.7 and its applicability to the facts of this case.

The Plaintiff's Motion to Bar is therefore GRANTED IN PART AND DENIED IN PART, as stated herein.

## SUMMARY JUDGMENT MOTIONS

## <u>SUMMARY JUDGMENT GENERALLY</u>

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be entered if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See <u>Jay v. Intermet Wagner Inc.</u>, 233 F.3d 1014, 1016 (7th Cir.2000); <u>Cox v. Acme Health Serv.</u>, 55 F.3d 1304, 1308 (7th Cir. 1995).

In ruling on a summary judgment motion, the court may not weigh the evidence or resolve

issues of fact; disputed facts must be left for resolution at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. Waldridge v. American Hoechst Corp., 24 F.3d 918, 922 (7th Cir.1994). The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, Erdman v. City of Ft. Atkinson, 84 F.3d 960, 961 (7th Cir. 1996); Vukadinovich v. Bd. of Sch. Trustees, 978 F.2d 403, 408 (7th Cir. 1992), cert. denied, 510 U.S. 844 (1993); Lohorn v. Michal, 913 F.2d 327, 331 (7th Cir. 1990); DeValk Lincoln-Mercury, Inc. V. Ford Motor Co., 811 F.2d 326, 329 (7th Cir. 1987); Bartman v. Allis Chalmers Corp., 799 F.2d 311, 312 (7th Cir. 1986), cert. denied, 479 U.S. 1092 (1987), and construing any doubts against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); Trotter v. Anderson, 417 F.2d 1191 (7th Cir. 1969); Haefling v. United Parcel Serv., Inc., 169 F.3d 494, 497 (7th Cir.1999).

The existence of "some alleged factual dispute between the parties," or "some metaphysical doubt," however, does not create a genuine issue of fact. Piscione v. Ernst & Young, L.L.P., 171 F.3d 527, 532 (7th Cir.1999). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." McDonald v. Village of Winnetka, 371 F.3d 992, 1001 (7th Cir. 2004). The proper inquiry is whether a rational trier of fact could reasonably find for the party opposing the motion with respect to the particular issue. See, e.g., Jordan v. Summers, 205 F.3d 337, 342 (7th Cir.2000).

The parties must identify the evidence (i.e. those portions of the pleadings, depositions, answers to interrogatories, admissions, affidavits, and documents) that will facilitate the court's assessment. Waldridge, 24 F.3d at 922. Thus, as Fed.R.Civ.Proc. 56(e) makes clear, a party opposing summary judgment may not rely on the allegations of her pleadings. Rather:

> [T]he adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

See, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). See also, Local Rule CDIL 7.1(D).

Neither the moving party nor the responding party may simply rest on allegations; those allegations must be supported by significant probative evidence tending. First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 290 (1968). See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)(when the moving party has met its burden, non-moving party must do more than show some "metaphysical doubt " as to material facts). A scintilla of evidence in support of the non-moving party's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250.

If the undisputed facts indicate that no reasonable jury could find for the party opposing the motion, then summary judgment must be granted. Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995), citing Anderson, 477 U.S. at 248. If the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party and on which that party will bear the burden of proof at trial, then summary judgment is proper. Celotex, 477 U.S. at 322; Waldridge, 24 F.3d at 920.

**UNDISPUTED FACTS**

Before beginning a recitation of undisputed facts, it is incumbent on the Court to comment that a significant number of the parties' statements of undisputed facts are neither "undisputed" nor "facts." For example, such statements as "Woller violated attorney standards for a criminal defense lawyer" and "At all times ... Woller was acting under a conflict of interest" and "Terry was actually innocent" and "Mr. Terry was not "innocent" of all charges" are legal conclusions, and they are based on underlying facts that are hotly disputed, such as what Woller told Terry or Sanders or what Terry or Sanders told Woller. As such, they should not have been included as undisputed facts.

In addition, some of the statements contain argumentative language that skews what might have been a "fact" into nothing more than speculation or opinion. For example, Defendant asserts as undisputed the fact that "Sanders did not 'rat out' Mr. Terry." Had this statement been "Sanders did not testify against Mr. Terry," or "Sanders never told anyone that Terry knew about the cannabis," the statement would likely have been undisputed. Stated the way it was, however, assumes that Terry had committed a crime, making it impossible for Plaintiff to admit the statement. Similarly, Plaintiff asserts as a fact that Woller "failed to humanize" him to the jury during the trial. While that phrase may have a general meaning, different practitioners could certainly have different ideas about when it is appropriate to "humanize" a party and how to do it. By failing to be more specific in the statement of what Woller failed to do, the statement is nothing more than counsel's opinion.

None of these questionable statements should have been included in the motions, and none of them have been taken into consideration by the Court in deciding the summary judgment motions. With those exclusions, unless otherwise noted, the following statement of facts is taken from the parties' statements of fact, the responses and replies thereto, and the evidence submitted in support

of various propositions.

Gregory Terry and Keith Sanders were friends from early childhood through high school. In 1988, Sanders was convicted of cocaine possession. In 1990, he was convicted of a weapons charge. After high school, Terry enlisted. About the same time as his service was over, Sanders was convicted of assault with intent to murder during a drug deal; in 1992 he was sentenced to 12 years for that conviction. The two men's friendship resumed after Sanders was released in 2005. At the time of the underlying events of this lawsuit, they saw each other once or twice every week.

The events leading up to this lawsuit began when Terry was a passenger in a car driven by Sanders on Interstate 80. Illinois State Police Sergeant Floyd Blanks stopped Sanders for speeding. Blanks asked Sanders for his license and registration and told him he had been speeding. Blanks also asked Sanders where he was coming from, and Sanders appeared confused. Sanders asked Terry the name of the city where they had been, and Terry then told Blanks they had been in Des Moines and referred to Sanders' cousin. Sanders gave the officer his driver's license and vehicle registration card. The registration card indicated that the car was leased to an Alice McClain. Sanders told Blanks that she was his girlfriend. Blanks testified that he thought he smelled cannabis.

Blanks returned to his squad car to write Sanders a warning ticket. When he returned, he testified that he noticed that the obvious odor of cannabis was stronger. He asked Sanders and Terry to step out of the car so he could search it. In the trunk Blanks found a cardboard microwave box taped closed. Another officer, Andy Fratzke, was assisting Blanks with the stop. Fratzke had his dog smell the packages. The dog gave a positive alert. Blanks opened the box and found two clear plastic wrapped bundles of what appeared to be cannabis. Later testing revealed that they contained 20

pounds of cannabis. The officers also found what appeared to be marijuana leaves[3] in the ashtray

of the car. Blanks arrested both men, charging Terry with unlawful possession of cannabis, unlawful

possession with intent to deliver, and cannabis trafficking.

During the ride to the police station, Sanders told Blanks that Terry "had nothing to do with

this. He was just a passenger. He was just along for the ride ... He didn't know nothing about

anything." (Sanders' dep. p.30). While being processed at the Henry County Jail, Sanders again

stated that Terry "didn't have nothing to do with this, the case, everything that they found belonged

to me. And if he could, you know, cut Greg loose." (Sander's dep. p.32). When asked if he knew that

this statement would put ownership of the cannabis on him, Sanders replied, "Yeah."

 Terry retained Edward Woller to represent him. Woller is an experienced criminal defense

attorney; ten to twenty percent of his practice is dedicated to felony criminal defense. He is a

member of the Illinois Public Defenders Association. He is the conflicts public defendant for Henry

County, and he assist the Stark County Public Defender's Office on a weekly basis.

At the time Terry retained Woller, Woller had already been retained by Sanders to defend

him in the criminal case against him. Terry was aware of the joint representation, and he asked

Woller if there would be a problem if he represented both of them. It is hotly disputed what Woller

told Terry about the joint representation at that time and thereafter. Before the second day of the

trial, the judge requested that Sanders be brought to the courthouse and appointed a public defender

to speak with him about testifying in Terry's trial. That public defender told the judge that Sanders

was willing to testify but was upset. Ultimately, Terry personally informed the judge that Sanders

---

[3]The leaves from the ashtray were never tested, so whether they were or were not
cannabis is not known.

would not be testifying at his trial. Once again, how that decision was reached is hotly disputed.

Before the Terry case went to trial, Sanders told Woller that he would not testify against Terry in Terry's trial. In his opening statement in Terry's trial, Woller told the jury that they "might" hear testimony from Sanders that would give them the "whole story." Despite that, Woller did not call Sanders as a witness in Terry's trial, nor did he attempt to have admitted Sanders' statements to the officers. Woller explained at his deposition that these were strategic legal decisions, based on his beliefs that the statements were inadmissible hearsay, not subject to any exception, and that he could cover the information contained in these statements and in Sanders' possible testimony by way of Terry's testimony and the testimony and cross examination of officers Blanks and Fratzke.

At trial, Terry testified on his own behalf. He stated that Sanders asked him to ride along with him from their hometown of Flint, Michigan, to Iowa to watch Sanders' cousin play in a basketball game. Terry stated that he did not know what town in Iowa he was traveling to, which cousin they were going to see, where the basketball game would be played, or what teams were playing. Terry testified that he fell asleep during the drive, and that he was asleep when the two arrived in Iowa. He testified that he remained in the car where he again fell asleep while Sanders went inside a house. When Sanders came out, he told Terry that they were going home because he could not get in touch with his cousin. Terry testified that he slept most of the way to Iowa, that he never drove, he never opened the trunk for any purpose, and he never saw the box in the trunk until the officer found it. Terry also testified that he knew nothing of Sanders' drug trafficking.

At the conclusion of Terry's trial, the jury found him guilty. The possession counts were merged into the trafficking conviction as lesser included offenses. He was sentenced to 12 years imprisonment. The Illinois Appellate Court reversed Terry's conviction, finding that the State had

produced "no evidence of actual or constructive possession" of the cannabis by Terry, an essential element of all three counts, and concluded that the State therefore failed to meet its burden of proof.

Sanders plead guilty at his arraignment hearing, but at some point thereafter that plea was withdrawn. His case went to trial. He was found guilty and was sentenced to 18 years.

In his second Amended Complaint (#35), Terry has alleged against Woller a legal malpractice tort claim (Count I), a legal malpractice contract claim (Count II), a fraud claim based on concealment of a conflict of interest (Count III), and a negligent misrepresentation claim based on concealment of a conflict of interest (Count IV). Counts I and II are based on the ways in which Woller's representation of Terry at trial were allegedly deficient[4]. Counts III and IV are based on what Woller allegedly said and did in order to get Terry to agree to the joint representation.

Terry has now moved for partial summary judgment, asserting that the undisputed facts establish his "actual innocence." Woller has opposed the motion.

Woller, too, has moved for summary judgment. As to Counts I and II, he asserts that Plaintiff is unable to meet his burden of proving the existence of a legal duty or that any damages Terry incurred were caused by any breach of such duty by Woller. The fraud and negligent misrepresentation claims, he argues, fail because there was no intentional concealment or misrepresentation of material facts. He also posits that the negligent misrepresentation claim is

---

[4]The *tort* of legal malpractice usually involves breach of an attorney's *contractual* duties. See, Schweihs v. Davis, Friedman, Zavett, Kane and MacRae, 800 N.E.2d 448 (Ill.App.2003). Even though based on the same misconduct, claims for the tort of legal malpractice and for breach of contract may both go forward if plead in the alternative. Collins v. Reynard, 607 N.E.2d 1185 (Ill.1992); Nettleton v. Stogsdill, 899 N.E.2d 1252 (Ill.App.2008). See also, Fed.R.Civ.P. 8(d).

improper under Illinois law.

**TERRY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

The legal malpractice tort claim requires proof of the following elements: (1) an attorney-client relationship; (2) a duty arising from that relationship; (3) a breach of that duty; and (4) actual damages proximately caused by that breach. Woidtke v. St. Clair County, 335 F.3d 558, 562 (7th Cir. 2003).

A claim against an attorney for malpractice may also be couched in terms of a breach of contract claim. Such claims require proof of (1) a valid enforceable contract; (2) performance of contractual duties by plaintiff; (3) breach of contractual duties by defendant; and (4) resulting damages to plaintiff. Dahlin v. Jenner & Block, - F.Supp. 2d -, 2001 WL 1195775,*4, Oct. 5, 2001 (N.D. IL).

In a malpractice action brought against a *criminal*[5] defense attorney, there is an additional element on which the plaintiff bears the burden of proof. He must prove, not that he would have been acquitted but for the attorney's negligence, but rather that he was in fact innocent of the crime charged in the matter in which the attorney represented him. Id.

The Seventh Circuit has since noted that only if a conviction is overturned does a legal malpractice claim lie; even then the plaintiff would have to prove that he was "in fact innocent, and not just lucky." Levine v. Kling, 123 F.3d 580 (7th Cir. 1997); see also Winniczek, 394 F.3d at 507 (7th Cri. 2005);  Kramer v. Dirksen, 695 N.E.2d 1288 (Ill.App.1998); Paulsen v. Cocharn, 826

---

[5]The standard is different than the one applicable to malpractice arising out of civil malpractice, where the plaintiff must prove that he would have won the underlying lawsuit were it not for attorney negligence. Winniczek v. Nagelberg, 394 F.3d 505, 507, citing *inter alia* Cedeno v. Gumbiner, 806 N.E.2d  1188, 1192 (Ill.App.2004).

N.E.2d 526, 530 (Ill.App.2005). An acquittal on retrial or a reversal on appeal is evidence that the fact finder may consider, but it is not enough to prove actual innocence. <u>Moore v. Owens</u>, 698 N.E.2d 707 (Ill.App.1998).

Terry asserts that he is "actually innocent", based on the opinion entered by the Illinois Appellate Court, reversing his conviction. That opinion did expressly hold that "there was no evidence of actual or constructive possession." Because conviction on any one of the three counts required proof of possession, the State had failed to meet its burden of proof. (Plaintiff's exh. 1).

The Appellate Court's holding, however, does not mean that no evidence of constructive possession existed; it simply means that no such evidence was presented at the criminal trial. The fact that Terry's conviction was reversed is simply the threshold issue: without that reversal, he could not even state a claim for malpractice. Without more, however, the reversal is not sufficient to show actual innocence.

Moreover, unlike the criminal trial, where Terry bore no burden of proving anything at all, in this civil case Terry does bear the burden of proof. Terry's motion and brief, however, rely almost exclusively on the Illinois Appellate Court's opinion. In large measure, in fact, his brief is simply a recitation of what the Court said in that opinion. That is not sufficient to meet his burden in this civil matter, because there is other evidence that will be considered here.

For example, in Terry's criminal trial. Sanders did not testify, so his credibility has never been tested; yet his credibility will be key in this civil case where he has stepped forward to offer support for Terry's claim of innocense. His credibility will be subject to close scrutiny. While in some cases, an undisputed statement by a witness might be sufficient to support an essential fact, in this case there is reason to put Sanders' credibility front and center.

Likewise, Terry's own credibility is crucial in this case, and it appears that the jury in his criminal trial could have found him less than credible. Simply because he says something does not make it so. There is enough, in light of Woller's expert's testimony, among other things, to make Terry's credibility a disputed issue.

The factors enumerated by Defendant's expert will undoubtedly provide a line of questioning designed to emphasize the credibility issues in this case. The expert's testimony directly calls into question the believability of crucial aspects of Terry's and Sanders' explanations for their actions on the days in question. Determining the weight to accord the expert's testimony is not something that can be accomplished on summary judgment. It is for the jury to determine how much, if any, weight to give to that testimony.

Terry's testimony, too, that he did not know anything about Sanders' criminal background is subject to challenge. Given how long he had known Sanders and how often they socialized together, and given Sander's criminal history, it might be thought that his claim of ignorance was at best sticking his head in the sand. Of course, Terry might be completely believable on this point. Resolution of that matter cannot be determined at this time.

As the Supreme Court has noted, "[o]ur legal system ... is built on the premise that it is the province of the jury to weigh the credibility of competing witnesses." Kansas v. Ventris, - U.S. -, 129 S.Ct. 1841, 1847 (U.S.2009).

Saying that there are credibility issues is not to state any foregone conclusion; it is simply recognition of the fact that Sanders' and Terry's credibility are matters for jury determination, not an issue for resolution upon motion. This Court cannot and will not rule that Terry or Sanders are - or are not - credible at the summary judgment stage of this case. To draw the conclusion that Terry

was actually innocent on this record would be to commit error. The Motion for Partial Summary Judgment is therefore **DENIED**.

**WOLLER'S MOTION FOR SUMMARY JUDGMENT**

Woller has moved for summary judgment on all four counts of the complaint. In considering these four Counts, the Court has remained cognizant of the distinction between the two legal malpractice claims - which allegedly arose out of Woller's conduct of the criminal trial - and the fraud and misrepresentation claims - which allegedly arose out of Woller's failure to recognize a conflict of interest and properly advise Terry about it.

Woller first attacks Count III , the claim for fraudulent concealment. Proof of the following elements is necessary for such a claim:

1. concealment of a material fact;
2. the concealment was intended to induce a false belief, under circumstances creating a duty to speak;
3. an innocent party could not have discovered the truth through a reasonable inquiry or inspection or was prevented from making a reasonable inquiry or inspection, and relied upon the silences as a misrepresentation that the fact did not exist;
4. the concealed information was such that the injured party would have acted differently had he been aware of it; and
5. reliance by the person from whom the fact was concealed led to his injury.

Trustees of the AFTRA Health Fund v. Biondi, 303 F.3d 765, 777 (7th Cir. 2002).

Woller argues that this claim fails for a number of reasons, each of which is discussed separately. First, Woller asserts that he never believed there was a conflict of interest, so his statements to Terry that there was no conflict of interest were statements of opinion, not fact. Under Illinois law, statements of opinion are not actionable as fraud. Dahlin v. Jenner & Block, LLC, - F.Supp. 2d  -, 2001 WL 1195775,*4, Oct. 5, 2001 (N.D. IL), citing Marino v. United Bank of Illinois, 484 N.E.2d 935, 938 (Ill.App.1985). As the Dahlin court noted, a representation is one of

opinion rather than fact only if it "expresses the speaker's belief, without certainty, as to the existence of a fact." 2001 WL 1195775 at *4, quoting <u>Neptuno Treuhand Und Verwaltungsgesellschaft Mbh v. Arbor</u>, 692 N.E.2d 812, 816 (Ill.App.1998).

As was true with Terry's arguments discussed above, credibility is key to Woller's defense. Woller does not argue in this motion that there was no conflict of interest, only that he did not believe there was one. Whether he is credible about that belief, in light of his professional background and the expert opinions that may be offered is not something that this Court can resolve on this motion. Moreover, Woller's testimony about what he told Terry is diametrically opposed to what Terry recalls about those discussions, illustrating the factual disputes that prevent entry of judgment on this issue. The credibility of Woller's explanation of his thought processes is a question that cannot be resolved here. Simply because Woller says something is so does not make it so. Plaintiff is entitled to test that belief.

Second, Woller asserts that he never intentionally (i.e. with knowledge) induced a false belief in Mr. Terry about any purported conflict of interest. This assertion, too, is premised on the assumption that the Court must accept Mr. Woller's testimony as true, even though there are bases for challenging his credibility on this issue.

Third, Woller posits that Terry was completely aware of Woller's joint representation, before he retained Woller and during the joint representation.. That is immaterial: a client may be completely aware of a fact yet unaware of its legal significance. That Terry knew of the joint representation does not mean that he knew or should have figured out that Woller may have been operating under a conflict of interest.

Fourth, Woller is of the opinion that Terry was satisfied with Woller's representation until

the jury verdict came back against him. Once again, the relevance of this argument is marginal at best. Assuming *arguendo* that there was a conflict, and that Woller had appropriately disclosed the conflict and all its ramifications to Terry, it is not difficult to imagine that Terry might not have been satisfied from the outset to retain Woller or to let Woller guide him in deciding whether to ask Sanders to testify on his behalf.

Finally, Woller asserts that any conflict was not the proximate cause of Terry's damages. This is simply the flip side of the "actual innocence" argument made by Terry, and it is rejected here for the same reasons that it was rejected above.

The motion as to Count III is denied.

Woller next attacks Count IV, the negligent misrepresentation claim. He first posits that the reasons this Count fails are the same reasons that the fraud claim fails. That argument is rejected for the same reasons it was rejected above.

Negligent misrepresentation involves the breach of a duty to use reasonable care in obtaining and communicating information upon which others may reasonably be expected to rely in the conduct of their business transactions. Restatement (Second) of Torts § 552 (1977); Hollywood Trucking, Inc. v. Watters, 895 N.E.2d 3, 9-10, (Ill.App. 2008). A claim of negligent misrepresentation requires proof of essentially the same elements as fraudulent misrepresentation[6], except that the defendant's mental state is different. The defendant need not know that the statement is false. His own carelessness or negligence in ascertaining its truth will suffice for a cause of action.

---

[6] A claim of fraudulent misrepresentation requires proof of the following elements: (1) a false statement of material fact; (2) known or believed to be false by the person making*343 it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance. Dilling, 888 N.E.2d at 45.

For negligent misrepresentation, a plaintiff must also allege that the defendant owes a duty to the plaintiff to communicate accurate information." Doe v. Dilling, 888 N.E.2d 24, 45 (Ill. 2008)

Woller asserts that these claims are not cognizable in the context of legal malpractice, citing Dahlin, 2001 WL 1195775 at *4. That is a misrepresentation of the holding in Dahlin, where the Court found that the misrepresentation claims legally inadequate because they were "merely restatements" of the legal malpractice and breach of contract claims. Here, it is clear that Counts III and IV are based on conduct that preceded Terry's trial, while Counts I and II are based on conduct during the trial. They are not simply restatements.

The motion as to Count IV is denied.

As to Counts I and II, Woller asserts that Plaintiff cannot meet his burden of proof to show the existence of a legal duty. An attorney's duty to a client is measured by the representation sought by the client and the scope of the authority conferred by the contractual agreement. Dahlin, 2001 WL 2001 WL 1195775 at *4. Hence, the client in a legal malpractice action claiming that the attorney failed to properly advise him must allege and prove that the scope of representation sought by the client included the advice that the defendant failed to give. Id.

Woller argues that because Woller discussed his joint representation with Terry, he cannot be liable for failing to advise Terry. This is without any merit, because what Woller told Terry is hotly disputed. Moreover, it ignores the distinction between the two malpractice claims and the fraud and misrepresentation claims: the malpractice claims arise out of Woller's conduct at trial. Woller's handling of the criminal defense at trial was precisely within the scope of any kind of agreement that the two might have reached.

Woller also argues that because Terry never signed a written contract with him, everything

he did was proper and in accord with all duties imposed by rules, regulations, and statutes. Once again, this conclusion must be drawn by the jury, because there are so many disputes about what Woller did at trial and why. Indeed, the question the jury must determine is precisely that: did Woller's handling of the criminal trial satisfy all of his legal duties to Terry.

The elephant in the room is whether there was a conflict of interest. Woller says he believes there was not; Terry asserts that there clearly was. Woller's motion skirts that question entirely, and Terry's motion (discussed above) did not raise it at all. It may have been possible to posit that the trial transcript along with legal authority about Rule 1.7 was sufficient to establish that Woller's conduct of the trial was (or was not) legally adequate as a matter of law. That argument, however, was not made by either party, and the Court is not about to embark on that legal inquiry on its own. The arguments that were made rely wholly on conclusions drawn from the motivations, the knowledge, the state of mind of the players in this unfortunate scenario. There are so many factual disputes that the legal questions presented cannot be resolved without a trial.

Woller's final salvo - that Terry cannot succeed without expert testimony - presumes that this Court barred Professor Kling's testimony. While his testimony has been significantly curtailed, he is not barred. He may opine about Rule 1.7 and how Woller's conduct of the trial fell short of satisfying his legal duties.

The motion is denied as to Counts I and II.

## CONCLUSION

As stated herein, the Plaintiff's Motion to Bar (#67) is GRANTED IN PART AND DENIED IN PART. The Defendant's Motion to Bar (#88) is GRANTED IN PART AND DENIED IN PART. The Plaintiff's Motion for Partial Summary Judgment (#77) is DENIED. The Defendant's Motion

for Summary Judgment (#92) is DENIED.

This case remains set for final pretrial conference on December 22, 2010 at 10:30 a.m., in person in Peoria, and for jury trial on January 31, 2011, at 9:00 a.m. in Rock Island. Agreed Final Pretrial Order with all exhibits and jury instructions are to be brought to the Final Pretrial Conference. Any motion in limine shall be filed no later than December 17, 2010.

ENTERED ON  December 7, 2010

                              s/ John A. Gorman

                   JOHN A. GORMAN
           UNITED STATES MAGISTRATE JUDGE